**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **BLUEBERRY FUNDING LLC,**<br>**Plaintiff,**<br><br>**v.**<br><br>**SIMCHA FELLER, individually and as sole member of YIC LICENSED BEHAVIOR ANALYST PLLC and sole shareholder of YIC SERVICES INC.;**<br>**MORDECHAI BEITEL, individually and as principal of the Beitel Group;**<br>**YIC LICENSED BEHAVIOR ANALYST PLLC;**<br>**YIC SERVICES INC.;**<br>**YICIF LLC;**<br>**METROPOLITAN MENTAL HEALTH PC;**<br>**XYZ COMPANIES 1-10 and JOHN DOES 1-10,**<br>**Defendants.** | **CASE NO.:**<br><br>***Civil Action***<br><br>**COMPLAINT WITH JURY DEMAND** |

Plaintiff, BLUEBERRY FUNDING, LLC ("Plaintiff' or "Blueberry"), files its Complaint against Defendant, SIMCHA FELLER, individually and as sole member of YIC Licensed Behavior Analyst PLLC and sole shareholder of YIC Services, Inc. ("Feller"); MORDECHAI BEITEL, individually and as principal of the Beitel Group ("Beitel"); YIC LICENSED BEHAVIOR ANALYST PLLC ("YIC PLLC"); YIC SERVICES, INC. ("YIC Services"); YICIF, LLC ("YICIF"); METROPOLITAN MENTAL HEALTH PC ("MetroMH""); XYZ Companies 1-10 and John/Jane Does 1-10 (collectively, "Defendants"), alleges as follows:

**INTRODUCTION**

1. This action arises from a deliberate criminal scheme in which Simcha Feller and Mordechai Beitel conspired with now indicted Mark J. Nussbaum, Esq. ("Nussbaum"), an attorney, and partner at his law firm, Nussbaum Lowinger LLP's IOLA Account (the "Firm's IOLA Account"- the nerve center of the scheme-for the advancement of $2,000,000 in bridge financing through a series of materially false financial representation, then sustained the fraud for twenty-six months through a coordinated campaign of fabricated promises transmitted through electronic means such as WhatsApp, iMessage, and email across wire facilities. Nussbaum unlawfully used $2,000,000.00 of Blueberry's funds maintained in the Firm's IOLA Account. The evidence comes from forensic datasets extracted from Nussbaum's communications, which capture the fraud from inception through collapse. Representative communications from those datasets are collected at Exhibit K; the native emails are at Exhibits A and B; the loan instruments at Exhibits C and D; the bank records at Exhibits E through J.

2. The scheme had three phases and three men. Mordechai Beitel conceived it. Feller confirmed to Nussbaum, Beitel's role: "He is a friend who came up with the idea of going to you.....we do many deals together." (Exhibit B.) At the time, Beitel was Feller's largest secured creditor—a $25 million senior lender with a Deposit Account Control Agreement ("DACA") giving him priority over every dollar in Feller's bank accounts—and was contractually prohibited from lending Feller more money directly. He admitted this himself: "I am part of the $25 million loan that he has on us Yes I Can business which legally it restricts me from giving him any additional funding." So Beitel routed Feller to Nussbaum to obtain capital through the Firm's IOLA account, vouched for Feller's financial condition with false representations, and spent two years suppressing Nussbaum's efforts to enforce his loan against Feller, using his own undisclosed senior

lien as a weapon. When litigation became unavoidable in March 2025, Beitel recorded a voice note to Nussbaum: "Mark i'm just hoping you're not putting my name on the lawsuit in anyway."

3. Simcha Feller was the borrower and the scheme's most prolific liar. He told Nussbaum his business had "$50mm" in revenue "on track to hit 13mm ebitda." He lied. Blueberry never heard any of it directly -- every representation went to Nussbaum, who held and deployed Blueberry's monies held in the Firm IOLA Account. His own business sale pitch eighteen months later -- prepared for a sophisticated buyer with maximum incentive to present the highest possible numbers -- disclosed actual 2022 EBITDA of $3,600,000. He fabricated a bank closing in Arizona (September 14, 2023). He invented a $2 million insurance settlement (January 29, 2024). He claimed an SBA loan from Live Oak Bank was "approved already" (May 20, 2024). He announced an appellate court victory that would produce a "full payoff" (December 30, 2024). None of these events occurred. On that same day—December 30, 2024—he disclosed $5.5 million sitting in bank accounts. He chose not to pay.

4. Mark J. Nussbaum, Esq. was the indispensable conduit. At the Firm, Nussbaum maintained the Firm's IOLA account at Signature Bank that served as the hub through which all funds flowed. He committed Blueberry's funds to the scheme in a single September 21, 2022 email -- "I can get it done for 2.5%. Please let me know asap" -- before any document was signed and without Blueberry's knowledge. He took $60,000 from Blueberry's funds as an unauthorized commission before disbursing a dollar to Feller. He actively managed enforcement suppression at Beitel's direction for two years, borrowing money at 5% per month from his own lenders to pay

iska[1] while not filing suit. Nussbaum is not a named defendant in this action;[2] he is a co-conspirator whose conduct is pleaded throughout to establish the enterprise and predicate acts.

5. The wire trace is complete and proven from both ends. Blueberry wired $5,170,000 from its New Jersey accounts to the Firm's IOLA Account on April 26, 2023. The April 2023 Signature Bank IOLA statement confirms receipt by sender name and reference number. Nussbaum wired $2,000,000 to Feller's YIC PLLC Chase account on May 2, 2023, Reference No. 20230502B6B7261F002325 (Exhibit H). The YIC PLLC Chase account -- Routing 021000021, Account *8579 -- appears in Feller's own May 2, 2023 WhatsApp wire instructions. Every dollar of Blueberry's deposited funds that reached Feller can be traced through a chain of timestamped wire records.

6. Blueberry brings this action to recover $2,000,000, treble damages under 18 U.S.C. 1964(c), punitive damages, and mandatory attorneys' fees.

**JURISDICTION AND VENUE**

7. Venue is proper in this District under 28 U.S.C. 1391(b)(2) and 18 U.S.C. 1965(a). The Firm's IOLA Account at Signature Bank -- the account into which Blueberry's $5,170,000 was wired and from which the $2,000,000 unauthorized disbursement was made -- was operated from Nussbaum's office at 225 Broadway, 36th Floor, New York, New York 10007, in this District. The September 21, 2022 enterprise formation email was sent and received in this District.

[1] Jewish law prohibits one Jew from lending money to another Jew with interest. Instead of one party being only a "lender" and the other being only a "borrower," the Heter Iska treats the party providing the funds as the investor and the party receiving the funds as the manager of the investment. The money is not treated as a simple loan. It is treated as capital placed into a business, property, investment, or other productive activity. The return paid to the investor is therefore not treated as interest on a loan, but as a return from an investment arrangement.

[2] Mark J. Nussbaum, Esq. and Nussbaum Lowinger LLP are not named as defendants in this action. Plaintiff's claims against Nussbaum and the Firm arising from the same conduct are being pursued in that proceeding and in separate litigation. Nussbaum and the Firm are pleaded here as co-conspirators whose acts are attributable to Defendants under 18 U.S.C. § 1962(d) and the law of civil conspiracy. Plaintiff expressly reserves, and does not waive or release, any claim against Nussbaum, the Firm, or any partner, member, or affiliate of the Firm, including the right to seek leave to join any of them in this action.

Every wire transfer at issue was directed from or received at 225 Broadway. A substantial part of the events and omissions giving rise to all claims occurred in this District.

**PARTIES**

8. Plaintiff Blueberry Funding LLC ("Blueberry") is a limited liability company organized under the laws of Delaware, authorized to conduct business in New York, with its principal place of business in Lakewood, New Jersey. Blueberry Funding's sole member is a Florida resident.

9. Defendant Simcha Feller ("Feller") is an individual residing at 2021 53rd Street, Brooklyn, New York 11204. Feller is the sole member of Defendant, YIC Licensed Behavior Analyst PLLC, and sole shareholder of Defendant, YIC Services Inc. He operated the YIC enterprise from 5309 18th Avenue, Suite 300, Brooklyn, New York 11204. Feller signed every loan instrument, directed every wire disbursement, transmitted every lulling lie, and is the primary borrower-side architect of the scheme.

10. Defendant Mordechai Beitel ("Beitel") is an individual residing in Brooklyn, New York, with a principal business address at 1021 38th Street, Brooklyn, New York 11219, doing business through the Beitel Group. Beitel conceived the scheme, held a pre-existing $25 million first-priority DACA-governed secured position against Feller's enterprise that contractually prohibited him from lending Feller additional money directly, routed Blueberry's funds through the Firm's IOLA Account as a workaround, made the city-revenue inducement misrepresentation, participated in the June 2023 lulling campaign, weaponized his own DACA position to suppress Nussbaum's enforcement of the loan, and coordinated subpoena obstruction with Feller through Nussbaum.

11. Defendant YIC Licensed Behavior Analyst PLLC ("YIC PLLC") is a New York

professional limited liability company (EIN 82-4459571). The $2,000,000 Loan 3 proceeds were wired directly to YIC PLLC's Chase account (Routing 021000021, Account *8579), Reference No. 20230502B6B7261F002325. YIC PLLC is the primary obligor on the Loan 3 note.

12. Defendant YIC Services Inc. ("YIC Services") is a New York corporation (EIN 47-1673235). YIC Services is a co-borrower on the Loan 3 note, jointly and severally liable with YIC PLLC, and received direct benefit from the loan proceeds. Its 2020 tax return discloses an ordinary loss of $6,318,232 -- known to Feller when he warranted that all financial statements were "true and correct in all material respects."

13. Defendant YICIF LLC ("YICIF") is a New York limited liability company controlled by Feller. YICIF served as the post-default financial conduit for the lulling scheme and made five of the seven lulling payments at Feller's and Beitel's direction.

14. Defendant Metropolitan Mental Health PC ("MetroMH") is a New York professional corporation controlled by Feller. MetroMH made the first lulling payment of $100,000 on June 16, 2023 -- the same day Beitel transmitted "Your getting your money today" -- serving as an instrument of the lulling fraud.

15. Defendants XYZ Companies are companies and entities presently unknown who participated in, facilitated, or received benefit from the scheme.

16. Defendants John Does 1-10 are individuals and entities presently unknown who participated in, facilitated, or received benefit from the scheme.

## STANDING

17. Blueberry has Article III standing. It suffered a concrete financial injury: $2,000,000 of its own funds were wired from its New Jersey accounts to the Firm’s IOLA Account and disbursed to YIC PLLC without Blueberry's knowledge or authorization. As of May 22, 2025,

$1,200,000 remains unpaid. These injuries are direct, traceable to Defendants and Co-Conspirators' misconduct, and redressable by this Court.

18. Blueberry has civil RICO standing under 18 U.S.C. 1964(c). Plaintiff is a direct victim of the conduct alleged herein. Feller's and Beitel's predicate wire-fraud acts are the proximate and but-for cause of its loss, with no intervening cause. Blueberry is the only directly injured party—Defendants' scheme was aimed squarely at Blueberry's funds. Each wire was transmitted from the Plaintiff's account, in its own name, and for its own benefit. None of the funds have been returned, despite due demand therefore.

19. Blueberry is a pure victim. It was not present for any financial representation Feller or Beitel made. It did not authorize any disbursement from the escrow funds held in the Firm's IOLA Account. It did not know Nussbaum had committed its funds to the scheme. No in pari delicto defense, no imputation defense, and no contributory negligence argument has any basis in the record.

20. Plaintiff's losses can be remedied by this Court through the damages, restitution, and treble damages sought below, including under 18 U.S.C. § 1964(c).

21. Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c) who has been injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c). The loss of the funds Plaintiff wired in trust into the Firm's IOLA Account is an injury to Plaintiff's property within the meaning of the statute, and that injury was proximately caused by the predicate acts of wire fraud and money laundering described herein.

22. Plaintiff's claims do not require privity with each Defendant. As alleged below, each Defendant either personally participated in the solicitation or misuse of Plaintiff's funds, knowingly received a portion of those funds or of the proceeds traceable to them, or knowingly

provided substantial assistance to the wrongdoing through which those funds were diverted.

23. For the reasons set forth above, Plaintiff has standing to assert each of the claims set forth below.

## FACTUAL ALLEGATIONS

### A. The Scheme Architecture: How the Fraud Was Structured

24. The scheme operated through a defined structure. Beitel originated deals and vouched for borrowers' financial condition to Nussbaum. Nussbaum held investor funds -- including Blueberry's -- in the Firm's IOLA Account and disbursed them to borrowers at Beitel's direction. Nussbaum took a two and a half percent (2.5%) commission on each deal, before disbursing principal to the borrower, without investor knowledge or consent. Feller was a recurring Beitel borrower who received multiple tranches of investor funds through this channel. Blueberry was told by Nussbaum and the Firm that its funds would be held in escrow in the Firm's IOLA Account, segregated and undisturbed, and released only upon Blueberry's written authorization. That representation was false. In truth, Nussbaum operated the Firm's IOLA Account as a commingled investor pool from which he deployed funds, including Blueberry's, to borrowers selected by Beitel, in the transactions referenced herein, and Nussbaum took a commission on each deployment. Blueberry never knew of, and never consented to, any loan to Feller, Beitel, or any entity they controlled. Blueberry learned that its funds had been deployed to Feller only after the fact. The escrow representation and the investor-pool operation are not two descriptions of the same arrangement. The first is what Blueberry was told; the second is the fraud.

### A(i). Prior Bad Act - The Government Loan Fraud: Fabricated Proof of Funds to Obtain a Federal Government Loan

25. Before Blueberry's escrow funds were misappropriated to the Defendants, Feller,

using the Firm's IOLA Account, executed a separate criminal fraud targeting a federal government loan program known as the Webster program. To obtain a government-backed loan through that program, they needed to demonstrate institutional credit capacity of at least $21,200,000. Rather than possess that credit, they manufactured it -- fabricating two promissory notes through sham round-trip transactions that cycled investor funds through the Firm's IOLA Account and back, then presenting the resulting notes as evidence of $21,200,000 in active institutional credit capacity. The entire "credit" was fake. The investor funds used to create it were deployed without investor knowledge or authorization. The counterparty to the Webster program -- a federal government entity -- was defrauded.

26. The mechanics were precise and deliberate. On September 30, 2022, Nussbaum wired $15,000,000 from the Firm's IOLA Account to Feller's YIC PLLC Chase account, Federal Reference Number 20220930B6B7261F002123 (Exhibit C). The note was due in three days. On October 3, 2022, YIC PLLC repaid $15,375,000 in two return wires -- the $375,000 premium being Nussbaum's 2.5% commission, charged against the investor pool without authorization. The loan lasted seventy-two hours and had a single economic purpose: to generate a promissory note payable to "MARK J. NUSSBAUM AS NOMINEE" in the face amount of $15,000,000 that could be circulated as proof of institutional lending capacity.

27. A second sham transaction followed on October 7, 2022. Nussbaum wired $6,200,000 from the Firm's IOLA Account to the IOLA account of Hersko and Ehrenreich P.C. (Routing 026013576, Account *6832) -- Feller's own transactional attorneys Federal Reference Number 20221007B6B7261F001507 (Exhibit D). YICIF repaid $6,510,000 on October 18 and 20, 2022, netting Nussbaum another $310,000 commission from the investor pool. A second note payable to "MARK J. NUSSBAUM AS NOMINEE" was generated in the face amount of

$6,200,000. Both retired notes were then presented to the Webster program counterparty as evidence that Feller's entity had access to $21,200,000 in active, arms-length institutional credit. Both notes represented zero live obligation at the time of submission. The "institutional lender" named in the notes was Nussbaum acting as nominee for a commingled investor pool. The entire credit capacity was a fabrication.

28. The forensic record establishes that Nussbaum, Feller and Beitel knew precisely what the sham transactions were for. On October 3, 2022 -- the same day Loan 1 was repaid -- Nussbaum asked Feller directly:

> **October 3, 2022 -- 11:14 AM -- Mark Nussbaum, WhatsApp to Feller:** *"lmk about balance --- i get paid back in full with webster closing? if yes, i can calendar for 3 weeks"*

This message is not ambiguous. Nussbaum was conditioning his own continued availability as a conduit -- his willingness to keep investor funds deployed for future Feller transactions -- on whether the Webster program closing would produce Nussbaum with a payoff from the sham notes. Nussbaum, Feller and Beitel knew the notes were being circulated to the Webster program. They knew the "institutional credit" was fabricated from the Firm's IOLA account. They helped manufacture the false proof of funds and demanded payment from the proceeds of the government fraud they helped create.

29. The Webster fraud was not a closed event. Feller continued to represent the Webster program as an active repayment source throughout the twenty-six-month lulling campaign. On November 21, 2024 -- eighteen months after Loan 3 matured -- Feller told Nussbaum:

> **November 21, 2024 -- Simcha Feller, WhatsApp to Nussbaum:** *"Webster loan in the next two weeks"*

No Webster loan closed. This representation was another in the series of fabricated repayment events Feller used to induce forbearance from Nussbaum enforcing the terms of the loan. The same government program Feller had used in 2022 to manufacture false proof of funds was now being

recycled in 2024 as a false promise of repayment.

30. The Webster thread runs through April 2025. On April 9, 2025, Nussbaum transmitted to Beitel:

> **April 9, 2025 -- Mark Nussbaum, WhatsApp to Beitel:** *"SSRGA Webster IOLA inx.pdf 1 page 37.42 KB pdf"*

Nussbaum was transmitting a Webster IOLA document to Beitel, nearly three years after the initial sham transactions. The Webster program was still active as a potential vehicle for proceeds. On April 28, 2025, Beitel confirmed in a voice note to Nussbaum that he had "evidence that the money went to wether" -- an admission confirming his knowledge, as of 2025, that investor funds had been deployed to the Webster program counterparty.

31. The government loan fraud constitutes three independent predicate acts under the RICO statute. First, wire fraud under 18 U.S.C. 1343: each sham loan wire transmitted through the Firm's IOLA Account -- the $15,000,000 outbound wire, the $15,375,000 return wire, the $6,200,000 outbound wire, and the $6,510,000 return wire -- was an interstate wire transmission in furtherance of a scheme to defraud. Second, bank fraud under 18 U.S.C. 1344: the presentation of the fabricated $21,200,000 in notes to the Webster program counterparty constitutes a scheme to obtain money under a government loan program by means of materially false and fraudulent representations about the nature, amount, and existence of institutional credit. Third, money laundering under 18 U.S.C. 1956: the round-trip transactions through the Firm's IOLA Account were designed to make fictitious investor pool extensions appear as legitimate arms-length institutional credit. These predicate acts establish that the Feller-Beitel Enterprise defrauded at least two victims – Blueberry, through unauthorized use of its escrow funds, and the Webster program counterparty -- satisfying the multi-victim element required to insulate the RICO pattern from single-scheme challenges.

32. Beitel was the architect, not a passive referral source. He confirmed his own role by directing deal formation from the very first exchange. On September 21, 2022, responding to a group inquiry about deploying investor funds, he wrote: "lets get on a “quick call to discuss deal structure." (Exhibit A.) He managed closings directly, writing on September 28, 2022: "Are we clear here? Any outstanding issues?" Feller confirmed Beitel's originating role in a September 28, 2022 email to Nussbaum: "He is a friend who came up with the idea of going to you.....we do many deals together."

33. Nussbaum's role was to supply investor funds without investor authorization. He committed Blueberry's capital to the scheme in a single sentence on September 21, 2022: "I can get it done for 2.5%. Please let me know asap." He was responding to a Beitel inquiry about funding availability. He sent this email before any loan document was prepared, before any financial representation was made, and without Blueberry's knowledge. This is the moment the scheme began.

**B. Phase One: Pre-Loan Misrepresentations That Induced Nussbaum to issue the $2,000,000.00 from the Firm’s IOLA Account (September-October 2022)**

34. To induce Nussbaum to advance $2,000,000 for Loan 3, which was ultimately taken from Blueberry’s deposited funds, Feller and Beitel made the following material misrepresentations.

**i. First Misrepresentation. Feller's $50 Million Revenue and $13 Million EBITDA Claim**

35. On October 3, 2022, Feller transmitted:

> **October 3, 2022 -- 5:24 PM -- Simcha Feller, WhatsApp to Nussbaum:** *"Revenue at 50mm on track to hit 13mm ebitda"*

This was false when transmitted.

36. Feller's actual 2022 EBITDA was $3,600,000. The disproof is Feller's own business

sale pitch transmitted on March 27, 2024 -- eighteen months later, created to maximize the purchase price for a sophisticated buyer, with every incentive to present the strongest possible numbers:

> **March 27, 2024 -- 4:54 PM -- Simcha Feller, WhatsApp (Business Sale Pitch):** *"ABA business in Fort Lee NJ, in business for over 10 years. 1. EBITDA for 2023 was 4.4mm 2. 2022 was 3.6mm 3. Business operates as a mom and Pop shop very small clientele from high end families who have expensive insurances."*

A 361% overstatement in October 2022 proved by Feller's own arms-length financial disclosure in March 2024.

**ii. Second Misrepresentation. Beitel's City Revenue Vouching**

37. On October 7, 2022, as Nussbaum was conducting due diligence for his investors, Beitel transmitted:

> **October 7, 2022 -- 7:25 AM -- Mordechai Beitel, WhatsApp:** *"And BTW Simcha has a business turning millions He will not lose it for 6m loan He is getting weekly from the city between 2 and 5m"*
> **October 7, 2022 -- 7:25 AM -- Mordechai Beitel, WhatsApp:** *"What I'm trying to say that even in case this will not close he will come up with the cash"*

38. Nussbaum's response demonstrates the lie's intended and actual effect: "Just doing my dd for my investors. I would lend you on word." Beitel's representation -- that Feller received $2 to $5 million per week in New York City government payments, enough to repay the loan regardless of any business transaction -- caused Nussbaum to suspend independent due diligence. The lie worked. Beitel, as Feller's $25 million senior lender with direct insight into Feller's revenue streams, knew or recklessly disregarded that no such weekly payments were flowing.

39. Feller proved it himself on May 16, 2024:

> **May 16, 2024 -- 5:49 PM -- Simcha Feller, WhatsApp to Nussbaum:** *"I just literally have no money for real, city just didn't pay till this month. They started now a bit for first time in 13 months."*

City payments had been absent for 13 consecutive months. Beitel's central liquidity guarantee was

a fabrication. New York City pays ABA service providers by reimbursement after claims review -- not in fixed weekly distributions of $2 to $5 million. Feller was present in the group WhatsApp when Beitel made this representation and said nothing to correct it. His silence constitutes omission.

**iii. Third Misrepresentation: Knowledge that Funds were not Nussbaum's Funds**

40. On October 7, 2022, in the group WhatsApp chat in which Feller and Beitel were both participants, Nussbaum wrote: "Just doing my dd for my investors. I would lend you on word." From that moment Feller and Beitel knew that the money Nussbaum deployed to them was not Nussbaum's own but belonged to third parties who were not in the conversation and who had no knowledge of the borrower. Having that knowledge, Feller had an obligation to disclose his entities' insolvency, the cessation of city payments, and every misrepresentation made to induce the advance before Blueberry's money moved on May 2, 2023. He said nothing. His silence was a fraudulent omission independently actionable under New York law.

**iv. Fourth Misrepresentation: The False Escrow Representation**

41. Feller represented to Nussbaum:

> **October 7, 2022 -- 7:22 AM -- Simcha Feller, WhatsApp:**
> *"Money wired is going to escrow"*

Immediately after making this representation to Nussbaum, Feller provided wire instructions directing Blueberry's funds -- through Nussbaum's IOLA -- to the account of Hersko and Ehrenreich P.C. (Routing 026013576, Account *6832) -- Feller's own transactional counsel. A law firm's IOLA account holding client funds is not an arms-length escrow.

**iv. Fifth Misrepresentation. Illusory Collateral**

42. Feller represented to Nussbaum:

> **February 28, 2023 -- 12:58 PM -- Simcha Feller, WhatsApp:**
> *"Want my planes as collateral? Or business."*

No proof exists that Feller owned planes, individually or through businesses. No FAA lien was recorded. No UCC was filed. No security interest was ever perfected in any aircraft or business asset. The offer was designed to create the appearance of security while having no intention of providing it.

**v. Sixth Misrepresentation. The Sworn Guaranty**

43. Feller executed a personal Guaranty notarized in Kings County on April 5, 2023, warranting that all financial statements were "true and correct in all material respects." This sworn warranty was false when signed. His 2020 YIC Services K-1 discloses a $6,318,232 ordinary loss; his 2021 YIC PLLC K-1 shows a $524,930 ordinary loss while Feller extracted $1,350,000 in personal distributions. A guarantor who swears to the accuracy of financial statements while knowing his entities are deeply insolvent is lying under seal.

**C. Phase Two: Beitel Solicits Loan 3 Without Feller's Knowledge (April 2023)**

44. On April 4, 2023 -- with Loan 2 already in default -- Beitel contacted Nussbaum directly to solicit a new loan, cutting Feller out entirely:

> **April 4, 2023 -- 4:35 PM -- Mordechai Beitel, WhatsApp to Nussbaum:** *"Wanna do a loan for simchi till after Yom tov?"*
> **April 4, 2023 -- 4:36 PM -- Mordechai Beitel, WhatsApp:** *"I have a loan available for him it'll take another few days so I need some space however need the money today"*

45. When Nussbaum asked why Beitel could not lend the money himself, Beitel recorded the voice note quoted above, admitting his contractual restriction. He then offered two promised repayment sources:

> **April 4, 2023 -- 5:14 PM -- Mordechai Beitel, WhatsApp:** *"1 large payment from city 2 refi on loan I'm working on"*
> **April 4, 2023 -- 5:15 PM -- Mordechai Beitel, Voice Note (transcribed):** *"refinance option payback is two things one is a large amount uh loan not a huge loan it's like a $7 million loan that we're working on which should be closing right after pays off and uh it's in the 15 range that will pay you out number two is payments from the city that's coming in in large amounts"*

46. The $7 million refinance never closed. The city payments were the same fiction Beitel had vouched for at origination -- and that Feller would later admit had been absent for 13 months.

47. Nussbaum confirmed Feller's exclusion:

**April 19, 2023 -- Mark Nussbaum, WhatsApp to Beitel:** *"All good. Simcha doesn't know yet"*

48. Beitel had solicited a $2 million loan on Feller's behalf -- without Feller's knowledge -- through a conduit he needed because he was legally prohibited from making the loan himself -- using the same non-existent repayment sources he had promised at origination.

49. Beitel exercised a managerial ability over Feller and his companies, such that Beitel conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs.

**C(i). Beitel's Role, Knowledge, and Financial Interest**

50. Beitel did not introduce Feller to Nussbaum and step aside. He ran the transactions as a principal. On September 21, 2022, copying his Beitel Group colleague Josh Veiner (jveiner@beitel.com), he wrote to Nussbaum: "lets get on a quick call to discuss deal structure." On September 28, 2022, he asked "Are we clear here? Any outstanding issues?" and pressed Feller: "Simcha your on it?" On October 7, 2022, he transmitted to Nussbaum the ten-page "Simcha Feller October Loan Proposal." On October 12, 2022, he told Nussbaum by voice note that he was "having a call in 15 minutes with the bank's attorney for the closing." On October 15, 2022, he reported that he had "called now the lawyer" and that the one missing item "they got done." On October 18, 2022, he described the transactions as his own: "you can see my deals perform let me know when you're ready for the next one." On October 20, 2022, at the Loan 2 closing, he supplied Nussbaum wire instructions for a third party, SHWE Group Inc., with the direction "This is for Shaya," and Nussbaum confirmed, "He got the wire." Beitel decided who got paid out of the

closing.

51. Beitel had a direct financial stake in every dollar Nussbaum deployed to Feller. By his own account he was "part of the $25 million loan" to Feller's enterprise, a facility secured by a Deposit Account Control Agreement under which the senior lender could "take control of accounts." That facility was in default. On April 23, 2025, Beitel told Nussbaum: "Simchi defaulted on his 25M loan and on his 10M loan from bank of hope." Each new dollar that reached Feller's accounts shored up the collateral securing the senior facility in which Beitel held an interest and postponed the day Feller's default became Beitel's loss.

52. Beitel could not put his own money into Feller. He said so: the senior facility "legally ... restricts me from giving him any additional funding." The Firm's IOLA Account was the workaround. On April 4, 2023, Beitel solicited Loan 3 from Nussbaum ("Wanna do a loan for simchi till after Yom tov?"), set the urgency ("need the money today"), and supplied the repayment story: "1 large payment from city 2 refi on loan I'm working on," and by voice note a "$7 million loan that we're working on which should be closing right after." No city payment came. No $7 million refinancing closed. Nussbaum confirmed on April 19, 2023: "All good. Simcha doesn't know yet." On April 10, 2023, Beitel pressed by voice note: "what's the situation with this guy he's not wiring back."

53. While soliciting the advance, Beitel did not disclose to Nussbaum, and never disclosed to Plaintiff, that his own senior position and the control agreement meant that any funds advanced to Feller would sit behind $25,000,000 of senior debt and could be swept from Feller's accounts at the senior lender's election. Upon information and belief, the JPMorgan Chase account into which Plaintiff's $2,000,000 was wired on May 2, 2023 was subject to that control agreement. Beitel had superior knowledge of these facts; they were not available to Nussbaum or Plaintiff;

and Beitel knew the advance was being made without them.

54. After the June 1, 2023 default, Beitel personally issued five false assurances of payment in ten days (June 7 through June 16, 2023). On December 6, 2023, he turned the undisclosed lien into a weapon against enforcement: "1st position lender has 25m open Once a lawsuit is filed he will take control of accounts as per the DACA agreement. Which means no one can get paid back before he has 25m." On November 7, 2024, he said "Please be smart and help yourself and DONT file." On May 9, 2025, Nussbaum's counsel confirmed that the confession of judgment had been held "because you asked me to." On May 12, 2025, Nussbaum told Feller: "Beitel tried really hard, but we out of time."

55. Beitel acted as Feller's agent and envoy to the lender. On February 5, 2025, Feller told Nussbaum: "I sent Yitzy and Mordy because I knew me coming to you would be inappropriate now." On December 4, 2024, Feller routed through Beitel the false instruction that a CPLR 3103 motion "automatically stays disclosure" of a subpoena. Feller's own description of the relationship, September 28, 2022: "we do many deals together."

56. Beitel knew what he had done. March 4, 2025: "mark i'm just hoping you're not putting my name on the lawsuit in anyway." April 8, 2025: "i'm just a middle man over here." A middleman does not structure the deal, transmit the proposal, sit on calls with the bank's counsel, call the loans "my deals," direct closing proceeds to his own payee, solicit a $2,000,000 advance the borrower does not know about, hold a senior lien on the borrower, and manage the lender's enforcement decisions for two years.

57. Beitel's conduct satisfies the operation-or-management test. Independently of RICO, Beitel is liable for his own misrepresentations of October 7, 2022 and April 4, 2023, for his concealment of the senior facility and the control agreement while soliciting the advance, for

aiding and abetting Feller's fraud, and for conspiracy. Loan 3 was Beitel's plan. The borrower did not know of it.

**D. The Loan Closes: Nussbaum's Fee, the Wire Trace, and the Unauthorized Disbursement (April-May 2023)**

58. On May 2, 2023, Feller confirmed the terms and provided the wire instructions that prove the theft:

> **May 2, 2023 -- 11:33 AM -- Simcha Feller, WhatsApp:** *"Alright, let's do 2mm instead of 1.5 for the same deal"*
> **May 2, 2023 -- 11:37 AM -- Simcha Feller, WhatsApp (Wire Instructions):** *"Yes I can licensed behavior analyst pllc Routing- 021000021 Account- *8579"*

59. The complete wire trace -- proven from both ends by the bank's own statement and wire advices (Exhibits E, F, G and H) -- is as follows:

| Date | Event | Amount | Reference / Account |
|---|---|---|---|
| 4/26/2023 | Blueberry wires to NLLLP IOLA (Tranche 1) | $3,300,000 | Ref: 20230426B6B7261F00083204260911FT01 |
| 4/26/2023 | Blueberry wires to NLLLP IOLA (Tranche 2) | $1,870,000 | Ref: 20230426B6B7261F00312504261629FT01 |
| 4/26/2023 | Total Blueberry funds in Nussbaum IOLA | $5,170,000 | Sig Bank Acct *1550 |
| 5/1/2023 | Nussbaum takes unauthorized commission | ($60,000) | MJN Iska -- not authorized by Blueberry (Exhibit J) |
| 5/2/2023 | Nussbaum wires to YIC PLLC Chase | ($2,000,000) | Ref: 20230502B6B7261F002325 -- Acct *8579 |
| 5/3/2023 | Remaining funds diverted to third parties by Nussbaum | ($3,110,000) | Mich Capital/Drillman (Exhibit I); Pomeranz/Krednik (Exhibit J) |

60. Both Blueberry wires appear on the April 2023 Signature Bank IOLA statement (Bates Flagstar_Bank_008406, page 14 of 46) by sender name and reference number. The $2,000,000 disbursement to YIC PLLC's Chase account is confirmed by Feller's own wire instructions transmitted that same morning. The trace is complete. Blueberry never authorized any disbursement to Feller, to YIC PLLC, or to any Feller-affiliated entity. At no point prior to the disbursement did Nussbaum disclose to Blueberry the identity of the borrower, the name of the entity receiving the funds, the financial representations made to induce the deployment, or the existence of any senior secured obligation against the borrower's assets.

61. The Loan 3 instruments, executed April 5, 2023 and notarized by Toby Weisberger in Kings County, contained defects confirming the haste and pretext of the transaction: (a) the interest rate field is blank; (b) the entity Confession of Judgment recites "Two MILLION Five hundred thousand" in words against "$2,000,000" in figures; (c) the Guaranty is dated April 20, 2023 but acknowledged April 5, 2023, and authorizes COJ filing if unpaid by April 20 -- six weeks before the June 1, 2023 maturity date. These defects are not clerical errors. They are the fingerprints of a transaction executed in a single afternoon by people who knew it was a vehicle for theft. Although the instruments were executed on April 5, 2023, the $2,000,000 was not wired until May 2, 2023, nearly a month later. During that interval every misrepresentation described above remained operative and uncorrected, and nothing had yet changed hands.

**E. Phase Three: The Lulling Campaign -- Thirteen Documented Lies Across Twenty-Six Months (June 2023-December 2024)**

62. The Loan 3 note matured June 1, 2023, less than one month after the wire transfer. Feller did not pay. What followed was not a good-faith workout. It was a deliberate, coordinated campaign of false promises -- each a separate act of wire fraud in violation of 18 U.S.C. 1343 --

transmitted via WhatsApp and iMessage across interstate wire facilities to Nussbaum, the Firm's IOLA Account. The campaign lasted twenty-six months. Each lie below was false when transmitted and induced Nussbaum to refrain from enforcement of the loan, together with interest at the statutory rate from May 2, 2023. Communications transmitted after the money has been obtained, designed to lull the victim into a false sense of security and postpone complaint or enforcement, are in furtherance of the scheme and are themselves predicate acts.

**i. First Lie. The Tuesday Refinancing -- June 1, 2023**

63. Feller represented to Nussbaum:

> **June 1, 2023 -- 10:19 PM -- Simcha Feller, WhatsApp:** *"Supposed to be refinanced today but it's being pushed to Tuesday. I'm working on a bridge"*

No refinancing closed Tuesday. The loan had just matured and Feller's first act was a date-specific lie calibrated to buy days that became weeks that became months.

**ii. Second Lie. "High Chance of Getting the Funds Today" -- June 6, 2023**

64. Feller represented to Nussbaum:

> **June 6, 2023 -- 9:13 AM -- Simcha Feller, WhatsApp:** *"High chance of getting the funds today which goes straight to you"*

Nothing arrived. The phrasing "high chance" was designed to generate optimism while avoiding a falsifiable commitment.

**iii. Third Lie. Beitel's Five False Assurances in Ten Days -- June 7-16, 2023**

65. When Feller's lulling failed, Beitel stepped in directly and transmitted five false promises in ten days:

> **June 7, 2023 -- 4:54 PM -- Mordechai Beitel, WhatsApp:** *"Simcha should have confirmation from lender shortly."*
>
> **June 7, 2023 -- 5:53 PM -- Mordechai Beitel, WhatsApp (group):** *"we should have signed docs tonight and funding tom am"*

**June 12, 2023 -- 3:10 PM -- Mordechai Beitel, WhatsApp:** *"Simchi should have loan docs in the next 10 min"*

**June 12, 2023 -- Mordechai Beitel, WhatsApp:** *"Should still be signed and funded before cut of time today"*

**June 16, 2023 -- 2:35 PM -- Mordechai Beitel, WhatsApp:** *"Your getting your money today"*

66. No documents were signed. No lender funded. No money arrived. Beitel -- who as Feller's $25 million senior lender had direct knowledge of Feller's true liquidity -- transmitted five false assurances knowing they were empty.

67. The only payment that followed was a $100,000 wire from MetroMH on June 16 -- less than 5% of one month's accrued interest, coordinated with Beitel's "Your getting your money today" promise to give it false credibility. Zero was applied to principal.

68. Later, Beitel instructed Nussbaum on November 7, 2024: "Please be smart and help yourself and DONT file i will keep you posted as it goes" -- a direct continuation of the suppression strategy he had pursued since June 2023.

**iv. Fourth Lie. The Fabricated Bank of Arizona Closing -- September 14, 2023**

69. Feller represented to Nussbaum:

**September 14, 2023 -- 8:53 PM -- Simcha Feller, iMessage to Nussbaum:** *"Had a crazy day today. The bank finally closed but only funded the term amount now I'm waiting for the line of credit money to come in. They funded it into their own account that I don't have access to yet. They are giving me access tomorrow but according to them can take a day or two to activate. With that I have a substantial amount to repay plus money from the business will be enough to send you."*

**September 14, 2023 -- 8:55 PM -- Simcha Feller, iMessage:** *"Funds are technically funded in my new account with the bank of Arizona but I need to wire it into chase so I can move it."*

70. No bank closed. No "Bank of Arizona" account was documented. No line of credit was funded. When Nussbaum immediately demanded: "Actually can you send me proof of these

funds?" and "Settlement statement," Feller produced nothing. This was a completely false narrative -- specific bank, specific account type, specific activation delay -- fabricated to buy weeks of forbearance.

**v. Fifth Lie. The $2 Million Insurance Settlement -- January 29, 2024**

71. Feller represented to Nussbaum:

> **January 29, 2024 -- Simcha Feller, WhatsApp:** *"Settled with Insurance for 2mm on Friday so that may help us as well"*

72. No insurance settlement was paid. No insurer, policy, claim number, or timeline was identified. The amount -- exactly $2 million -- matched the outstanding principal, implying a single payment would retire the debt. Nothing followed.

**vi. Sixth Lie. "Selling One of My Companies...Closing in Weeks Max 4 Weeks" -- March 2024**

73. Feller represented to Nussbaum:

> **March 11, 2024 -- 12:27 PM -- Simcha Feller, WhatsApp:** *"Selling one of my companies to a friend, closing in weeks max 4 weeks"*
>
> **March 27, 2024 -- Simcha Feller, WhatsApp:** *"Working round the clock to close the sale"*

74. No company was sold. On the very same day Feller claimed to be "working round the clock to close the sale" -- March 27, 2024 -- he transmitted the business pitch disclosing actual 2022 EBITDA of $3.6 million: the document that definitively disproves his $13 million inducement claim at origination. He was simultaneously fabricating a sale and destroying his own origination lie.

**vii. Seventh Lie. The Live Oak Bank SBA Loan -- May-June 2024**

75. Feller represented to Nussbaum:

**May 20, 2024 -- Simcha Feller, WhatsApp:** *"It's Live Oak Bank"*

**May 20, 2024 -- Simcha Feller, WhatsApp:** *"SBA loan"*

**May 20, 2024 -- Simcha Feller, WhatsApp:** *"It's approved already we are just sending in new Operating agreement and some minor stuff bank is doing on my properties"*

**June 4, 2024 -- 4:13 PM -- Simcha Feller, WhatsApp:** *"Live Oak is almost closing they didn't give me final date but I should know this week the exact date"*

76. "Approved already" on May 20. "Almost closing" with no date on June 4. Then silence. No Live Oak SBA loan closed. No commitment, approval, or documentation was ever produced. The pattern -- named institution, imminent closing, no follow-through -- replicates every other false promise in this record. Feller ran the same play every time enforcement threatened.

**viii. Eighth Lie. Beitel Weaponizes His Own Senior Lien to Suppress Enforcement -- December 6, 2023**

77. Beitel commenced asserting his senior lien, in order to discourage Nussbaum from filing an enforcement action against the loan. Beitel stated:

**December 6, 2023 -- Mordechai Beitel, WhatsApp to Nussbaum:** *"In this specific case filing will only get you paid in 5 years"*

**December 6, 2023 -- Mordechai Beitel, WhatsApp:** *"1st position lender has 25m open Once a lawsuit is filed he will take control of accounts as per the DACA agreement. Which means no one can get paid back before he has 25m"*

**December 6, 2023 -- Mordechai Beitel, WhatsApp:** *"I'm just being realistic and honest. Filing is the a wrong move. Unless all you want is to screw Simcha and you don't care about the money"*

**December 6, 2023 -- Mordechai Beitel, WhatsApp:** *"The reason I'm personally not communicating is because I'm working day and night to resolve this issue"*

**December 6, 2023 -- Mordechai Beitel, WhatsApp:** *"I'm bz with it day and night to get you out"*

78. This is the most cynical act in the record. Beitel used his own $25 million DACA lien -- the very position he had concealed from Nussbaum at origination -- as a weapon to prevent Nussbaum from filing suit. Beitel threatened Nussbaum that any lawsuit would trigger his DACA, giving him priority over all recoveries, and guarantee Blueberry would wait "5 years." The threat was deployed by the person who held the senior position being threatened, to protect his own leverage, while simultaneously claiming to be working "day and night" to resolve a debt that he was actively preventing from being collected. Nussbaum received this sequence and delayed enforcement.

79. Three months later, in a September 9, 2024 WhatsApp to Beitel, Nussbaum disclosed that he had quietly filed a UCC financing statement against Feller's assets for his own protection: "I filed a ucc and not coj. I only did the state and not kings county. It shouldn't raise any serious red flags." The custodian of investor funds was protecting his own position at those investors' expense.

**ix. Ninth Lie. Judgment Creditor Admission -- May 14, 2024**

80. Feller admits that he has a judgment lien against him,

> **May 14, 2024 -- 2:49 PM -- Simcha Feller, WhatsApp:** *"I am in court now with some a**hole who wanted 525% and he now has a hold on 3.5mm in my account"*

81. By May 2024 a judgment creditor had already frozen $3.5 million of Feller's funds at 525% annual interest rates. Feller was simultaneously borrowing at high rates, defaulting on the $2 million loan, and representing imminent sales and closings. The existence of these prior-ranking enforcement creditors was never disclosed at origination.

**x. Tenth Lie. The City Payment Admission Destroys the Original Fraud -- May 16, 2024**

82. Feller represented:

> **May 16, 2024 -- 5:49 PM -- Simcha Feller, WhatsApp:** *"I just literally have no money for real, city just didn't pay till this month. They started now a bit for first time in 13 months."*

83. This admission does double work. It is Feller's Tenth Lie -- representing that city payments had now finally resumed. And it is the definitive disproof of Beitel's October 2022 inducement: the "$2 to 5m weekly from the city" guarantee had not existed for 13 consecutive months. The cash flow Beitel vouched as a repayment source was a fabrication.

**xi. Eleventh Lie. "Selling for Big Number on Metro" -- May 16, 2024**

84. Feller represented:

> **May 16, 2024 -- 5:47 PM -- Simcha Feller, WhatsApp:** *"I'm selling for big number on the end Metro"*

85. In the same conversation where Feller admitted he had "literally no money for real," he claimed to be selling Metropolitan Mental Health for a "big number." No MetroMH sale occurred. Simultaneous poverty and windfall -- the constant pattern.

**xii. Twelfth Lie. The Fictitious Appellate Victory -- December 30, 2024**

86. Next, Feller represented:

> **December 30, 2024 -- 11:48 AM -- Simcha Feller, WhatsApp:** *"I just won in appeals court, if on a few days cash is released I will work on the full payoff"*

87. Nussbaum corrected this in real time:

> **December 30, 2024 -- Mark Nussbaum, WhatsApp to Feller:** *"This doesn't release your funds tzadik. Just prevents them from acting."*

88. Nussbaum knew the appellate ruling released nothing. He told Feller directly. Yet even Nussbaum did not immediately file the enforcement action.

**xiii. Thirteenth Lie. "$5.5mm in the Banks" While Refusing to Pay -- December 30, 2024**

89. Feller represented to Nussbaum:

> **December 30, 2024 -- 12:22 PM -- Simcha Feller, WhatsApp:** *"Just in insurance alone they froze millions on top of 5.5mm in the banks so as much as I got payments they still put me back a lot. I want this over more then you but I think we are getting ahead now"*

90. On the same day Feller promised a "full payoff" from his appellate victory, he disclosed $5.5 million in bank accounts. Blueberry's outstanding principal was $2,000,000. Feller's non-payment was a choice, not a hardship.

**F. The Enterprise Collapses: Feller's Admissions (November 2024)**

91. By November 2024, Feller admitted his enterprise was defunct:

> **November 21, 2024 -- Simcha Feller, WhatsApp:** *"I don't have YIC payroll anymore so things are much calmer now"*

> **November 21, 2024 -- 11:43 AM -- Simcha Feller, WhatsApp:** *"Ye, I just lost over 20mm a year but it's probably for the best"*

92. YIC had no payroll. The enterprise had lost $20 million in annual revenue. The business whose imminent sale, refinancing, SBA approval, insurance settlement, and appellate victory Feller had promised for twenty-six months had ceased operations. Feller had sustained the lulling campaign knowing the represented repayment sources would never materialize.

**G. Beitel and Feller Obstruct Enforcement (October-December 2024)**

93. As creditors began enforcement proceedings, Nussbaum received a third-party subpoena. On October 30, 2024:

> **October 30, 2024 -- 6:35 PM -- Simcha Feller, WhatsApp to Beitel:** *"CPLR 3103 and 3104"*

94. On December 4, 2024, Feller escalated with a false statement of New York law to

Beitel:

> **December 4, 2024 -- 9:33 PM -- Simcha Feller, WhatsApp to Beitel:** *"Nussbaum is emailing me. Tell him that they are lying to him. Under cplr 3103, a motion for a protective order automatically stays disclosure of the discovery being sought"*

95. This was false. CPLR 3103 does not provide an automatic stay upon the mere filing of a motion; a court order is required. Berkovitch and Bouskila PLLC, Nussbaum's attorney, confirmed in a December 4, 2024 message: "Following up on the subpoena, your response is overdue. Please advise if you will be complying with the subpoena so we can avoid motion practice." Nussbaum's own attorney confirmed the same day there was no stay. Feller directed a false legal instruction through Beitel as intermediary to obstruct compliance with a lawful subpoena.

96. Beitel's consciousness of guilt crystallized in a March 4, 2025 voice note to Nussbaum:

> **March 4, 2025 -- Mordechai Beitel, Voice Note (transcribed):** *"mark i'm just hoping you're not putting my name on the lawsuit in anyway"*

97. The person who conceived the scheme, vouched for the pre-loan financial misrepresentations, solicited the second tranche while legally prohibited from doing so, transmitted five false lulling assurances in ten days, weaponized his senior lien to suppress enforcement, and coached subpoena obstruction -- does not call an attorney to express hope that his name stays off a complaint unless he knows he exerted managerial ability throughout the transaction.

### H. Nussbaum's Admissions Close the Evidentiary Circle

98. Three Nussbaum communications confirm the debt, the suppression, and Beitel's active management of both.

99. First, on July 25, 2023, the Firm issued a formal payoff letter confirming an outstanding balance of $2,280,000 good through August 16, 2023, with payment to Flagstar Bank, NUSSBAUM LOWINGER LLP IOLA, Routing 026013576, Account *1550. The balance was not paid.

100. Second, on May 9, 2025, Nussbaum forwarded to Beitel a message from his own attorney: "Mark, I've been holding the investor at bay with the Feller COJ, because you asked me to, but I cannot do so any longer. The investor is demanding that the COJ be filed Monday morning." The attorney's message confirms: (a) Blueberry had been demanding the COJ filing for some period; (b) Nussbaum had been holding it at Beitel's specific request; and (c) Beitel was the active manager of enforcement suppression.

101. Third, on May 12, 2025, after two years of suppression, Nussbaum finally wrote to Feller:

> **May 12, 2025 -- Mark Nussbaum, WhatsApp to Feller:** *"filing COJ today, sorry, Beitel tried really hard, but we out of time, investors will not let me wait longer"*

102. "Beitel tried really hard." Four words confirming everything: Beitel was the active manager of enforcement suppression for two years, working to prevent judgment from being filed while interest accrued. Nussbaum filed only when forced.

103. Fourth. on May 22, 2025:

> **May 22, 2025 -- Mark Nussbaum, WhatsApp to Beitel:** *"Feller owes 1.2MM in principal, can he pay 1mm now and be done?"*

104. Two and one-half years after the loan matured, Nussbaum confirmed $1,200,000 in outstanding principal. No meaningful principal payment has ever been made.

## I. The Seven Lulling Payments: Money Laundering

105. Between June 2023 and May 2024, seven payments totaling $800,000 were wired

from YIC entities to the Firm's IOLA Account. Not one dollar reached Blueberry. Each was labeled "interest" and each was coordinated with a contemporaneous false promise:

| Date | Amount | Entity | Federal REF (truncated) | Concurrent Lie |
|---|---|---|---|---|
| 6/16/2023 | $100,000 | MetroMH | 20230616B6B7261F002870... | Beitel: "Your getting your money today" |
| 6/20/2023 | $100,000 | YIC PLLC | 20230620B6B7261F002289... | Post-"funding tom am" false close |
| 9/26/2023 | $350,000 | YICIF | 20230926B6B7261F002613... | Amid Bank of Arizona fabrication |
| 10/24/2023 | $100,000 | YICIF | 20231024B6B7261F000322... | Post-Bank of Arizona silence |
| 1/18/2024 | $50,000 | YICIF | 20240118B6B7261F001637... | Before insurance settlement lie |
| 5/17/2024 | $50,000 | YICIF | 20240517B6B7261F001732... | After 525% judgment admission |
| 5/20/2024 | $50,000 | YICIF | 20240520B6B7261F002165... | Same week as SBA approval lie |

106. Each payment used proceeds of wire fraud in a financial transaction designed to conceal their nature and manufacture the appearance of legitimate debt service. Four facts establish the money-laundering intent: (1) every payment was labeled "interest" -- directing attention away from the untouched $2 million principal; (2) payments came from three different entities with no independent lending relationships; (3) each was coordinated with a contemporaneous false lulling promise; and (4) the amounts declined systematically -- $200,000 in June 2023 to $50,000 per payment by May 2024 -- consistent with deliberate management of creditor patience rather than genuine debt service.

## RICO ENTERPRISE AND PATTERN

**Enterprise**

107. From at least September 21, 2022 through the present, Feller, Beitel, YIC PLLC, YIC Services, YICIF, and MetroMH constituted an association-in-fact enterprise (collectively referred to as the "Feller-Beitel Enterprise") within the meaning of 18 U.S.C. 1961(4). Nussbaum participated in the Enterprise as a co-conspirator whose conduct is pleaded throughout as part of the pattern; he is not a named defendant. The Enterprise's common purpose was to obtain investor funds through false representations, prevent repayment through sustained wire fraud, and suppress enforcement through coordinated lulling and obstruction.

**Conduct and Participation**

108. Each Defendant conducted or participated in the operation or management of the Enterprise's affairs. Feller signed every instrument, directed every wire, and authored every lulling misrepresentation. Beitel conceived the scheme, made the city-revenue inducement, solicited Loan 3 without Feller's knowledge, coordinated the June 2023 lulling assurances, weaponized his DACA position, and coached subpoena obstruction. YIC PLLC received $2,000,000 directly. YIC Services is a co-obligor. YICIF made five of seven lulling payments. MetroMH made the first coordinated lulling payment. Beitel's liability is independently established by Feller's own email establishing him as the scheme's originator -- the highest level of operational participation.

**Pattern of Racketeering Activity**

109. The Enterprise engaged in a pattern of racketeering activity satisfying both relatedness and continuity, consisting of the following predicate acts, each transmitted via interstate wire: The predicate acts span more than thirty months, from September 2022 through

May 2025, involve at least two victims and six participants, and comprise more than two dozen separate wires and transmissions.

| No. | Date | Statute | Actor/Act |
|---|---|---|---|
| PA-1 | 9/21/2022 | 18 U.S.C. 1343 | Nussbaum email: "I can get it done for 2.5%" -- enterprise formation, commits investor funds without authorization |
| PA-2 | 9/28/2022 | 18 U.S.C. 1343 | Feller email: "He is a friend who came up with the idea" -- confirms Beitel as originator, enterprise architecture established |
| PA-3 | 9/30/2022 | 18 U.S.C. 1343/1344 | Nussbaum wires $15M to YIC PLLC -- sham loan for proof-of-funds fraud targeting Webster program |
| PA-4 | 10/3/2022 | 18 U.S.C. 1343 | Feller: "Revenue at 50mm on track to hit 13mm ebitda" -- false EBITDA to induce lending |
| PA-5 | 10/3/2022 | 18 U.S.C. 1343 | Nussbaum: "lmk about balance --- i get paid back in full with webster closing" -- Nussbaum's knowledge of POF purpose |
| PA-6 | 10/7/2022 | 18 U.S.C. 1343 | Beitel: "He is getting weekly from the city between 2 and 5m" -- false city-revenue inducement |
| PA-7 | 10/7/2022 | 18 U.S.C. 1343 | Feller: "Money wired is going to escrow" -- false security representation |
| PA-8 | 4/4/2023 | 18 U.S.C. 1343 | Beitel voice note: "legally it restricts me from giving him any additional funding" -- concealment of conflict while soliciting Loan 3 |
| PA-9 | 4/4/2023 | 18 U.S.C. 1343 | Beitel: "$7 million loan...payments from the city" -- false repayment representations to solicit Loan 3 |
| PA-10 | 4/26/2023 | 18 U.S.C. 1343/1344 | Blueberry wires $5,170,000 to NLLLP IOLA -- received by enterprise, deployed without authorization |
| PA-11 | 5/1/2023 | 18 U.S.C. 1956 | Nussbaum $60,000 "MJN Iska" diversion -- misappropriation of investor funds as unauthorized commission |

| No. | Date | Statute | Actor/Act |
|---|---|---|---|
| PA-12 | 5/2/2023 | 18 U.S.C. 1343/1344 | $2,000,000 wired to YIC PLLC REF 20230502B6B7261F002325 -- completing the principal theft |
| PA-13 | 6/1/2023 | 18 U.S.C. 1343 | Feller: "Supposed to be refinanced today...pushed to Tuesday" -- Lulling Lie 1 |
| PA-14 | 6/7/2023 | 18 U.S.C. 1343 | Beitel: "we should have signed docs tonight and funding tom am" -- Lulling Lie 3 (Beitel vouching) |
| PA-15 | 6/16/2023 | 18 U.S.C. 1343 | Beitel: "Your getting your money today" -- Lulling Lie 3, coordinated with $100K MetroMH payment |
| PA-16 | 9/14/2023 | 18 U.S.C. 1343 | Feller: "bank finally closed...bank of Arizona" -- Lulling Lie 4, fabricated closing narrative |
| PA-17 | 1/29/2024 | 18 U.S.C. 1343 | Feller: "Settled with Insurance for 2mm on Friday" -- Lulling Lie 5, phantom settlement |
| PA-18 | 3/11/2024 | 18 U.S.C. 1343 | Feller: "Selling one of my companies...closing in weeks max 4 weeks" -- Lulling Lie 6 |
| PA-19 | 5/20/2024 | 18 U.S.C. 1343 | Feller: "It's approved already" (Live Oak SBA) -- Lulling Lie 7, phantom SBA approval |
| PA-20 | 12/4/2024 | 18 U.S.C. 1343 | Feller to Beitel: false CPLR 3103 instruction to obstruct subpoena via interstate wire |
| PA-21 | 12/30/2024 | 18 U.S.C. 1343 | Feller: "I just won in appeals court...full payoff" -- Lulling Lie 12, fictitious appellate victory |
| PA-22 to PA-28 | 2023-2024 | 18 U.S.C. 1956/1957 | Seven lulling payments totaling $800,000 -- wire-fraud proceeds used to manufacture appearance of debt service |

110. The predicate acts are related -- same victim, same participants, same scheme purpose -- and continuous, spanning September 2022 through at least December 2024. The multi-victim nature of the scheme eliminates any single-scheme/single-victim limitation concern. Blueberry was injured in its business and property in an amount not less than $2,000,000 directly

and proximately by reason of these violations. 18 U.S.C. 1964(c).

**PLAINTIFF LEARNED OF THE DAMAGES CAUSED BY THE ENTERPRISE**

111. Following the death of Mendel Steiner, on or about January 9, 2025, Blueberry requested the return of its escrowed funds from the Firm on or about January 10, 2025

112. Thereafter, on January 14, 2025, the Firm forwarded correspondence to Blueberry claiming that the "Firm's escrow account may have been illegally accessed and substantially depleted as a result of irregular transactions."

113. The Firm further advised that it contacted the banking institution where Blueberry's escrow funds were being maintained in escrow and that the account was now frozen, with no disbursements possible. Accordingly, the Firm was unable to disburse any funds to Blueberry.

114. Following a second demand for the release of its funds on January 15, 2025, the Firm sent Blueberry an email advising that it was no longer operating as a functional entity and that if Blueberry had funds in the Firm's IOLA account, it should contact counsel retained by the Firm to wind down its operations.

115. Blueberry never received any of its escrowed funds back after correspondence with the Firm's wind-down counsel.

116. To date, Blueberry has not recovered any funds they committed to the Firm, and inappropriately used by Feller-Beitel Enterprise and Nussbaum. Through investigation, the evidence supplied herein was provided from forensic datasets extracted from Nussbaum's communications, which capture the fraud from inception through collapse.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. §1962(C)
### (All Defendants)

117. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

118. At all relevant times, Plaintiff is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

119. At all relevant times, each Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

120. At all relevant times, Defendants formed and orchestrated an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The association-in-fact enterprise created by Defendants had the common purpose of carrying out related fraudulent schemes as described above-all intended to extract loan proceeds from the Firm with no intention of repaying them back and to ensure that Plaintiff would be unable to recover the monies they deposited into the Firm IOLA Account.

121. The participants in the association-in-fact enterprise remained constant throughout the execution of the schemes and had an ongoing framework for carrying out the schemes, including but not limited to improperly transferring Plaintiff's funds out of the Firm's IOLA account and failing and refusing to remit to Plaintiff the monies owed to them.

122. As a result of the enterprise's criminal conduct, the Plaintiff lost the collective amount of $2 Million wired to the Firm's IOLA account. As described herein, the enterprise was structured as follows to accomplish the goals of the criminal scheme through false representations,

prevent repayment through sustained wire fraud, and suppress enforcement through coordinated lulling and obstruction.

123. Importantly, the success of this scheme depended on the preparation of loan documents, disbursements by the Firm's IOLA Account, misrepresentations and lulling tactics to avoid repayment, that appeared facially proper while concealing the true source and destination of the funds that were ultimately misappropriated.

124. Nussbaum, as managing partner of the Firm and as the attorney-of-record on the Firm's IOLA account, conducted and participated in the conduct of the affairs of the enterprise. Nussbaum solicited Plaintiff's deposits into the Firm's IOLA account, represented to Plaintiff that the funds would be safely held in escrow, and thereafter directed and authorized the diversion of Plaintiff's funds out of the Firm's IOLA account to YIC PLLC and Feller.

125. Beitel, the scheme originator, personally arranged for Feller, through Feller's co-conspirator entities, to obtain Plaintiff's escrow funds from the Firm's IOLA Account. Beitel introduced Feller to Nussbaum, made the city-revenue inducement, solicited Loan 3 directly without Feller's knowledge, coordinated the June 2023 lulling assurances, weaponized his DACA position, coached subpoena obstruction, and communicated constantly with Nussbaum regarding loan transactions, wire timing, payment arrangements, collection efforts, and other acts.

126. Feller signed every instrument, directed every wire and authored lulling misrepresentations through individually and his entities, YIC PLLC, YIC Services, YICIF, and MetroMH.

127. Defendant, YIC PLLC received $2,000,000 directly.

128. Defendant,  YIC Services is a co-obligor on Loan 3.

129. Defendant, YICIF made five of seven lulling payments.

130. Defendant, MetroMH made the first coordinated lulling payment.

131. The Feller-Beitel Enterprise ran and operated their fraudulent scheme and conspiracy.

132. To maintain that illusion and prevent the scheme from unraveling, Nussbaum, with the knowledge of and aided and abetted by the Defendants, solicited investors, including Plaintiff, to provide escrow funds.

133. Plaintiff was expressly told that their money would be safely held in the Firm's IOLA account, would not be moved without their authorization, and would be returned.

134. Plaintiff was not informed that their money would instead be used to facilitate or backstop fraudulent transactions or to fund improper disbursements to insiders.

135. Plaintiff's funds was then, without their knowledge, transferred out of the Firm's IOLA account by Nussbaum and not returned.

136. Consequently, the Plaintiff lost all money it had wired into the Firm's IOLA account.

137. At all relevant times, Defendants conducted or participated, directly and indirectly, in the conduct of the association-in-fact enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) of the RICO statute, in violation of 18 U.S.C. § 1962(c).

138. From at least September 21, 2022 through the present, the Feller- Beitel Enterprise within the meaning of 18 U.S.C. 1961(4). The Enterprise's common purpose was to obtain investor funds through false representations, prevent repayment through sustained wire fraud, and suppress enforcement through coordinated lulling and obstruction.

139. At all relevant times, the association-in-fact enterprise alleged herein was engaged

in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c). As alleged herein, the Defendants prepared or approved loans, processed interstate wire transfers, and controlled the lulling payments.

140. The pattern of racketeering activity consisted of multiple predicate acts indictable under 18 U.S.C. § 1961(1), including but not limited to: wire fraud.

141. Wire Fraud (18 U.S.C. § 1343): As alleged herein, Defendants caused loan proceeds to be sent and received by U.S. Mail and/or wire transfer from the Firm's IOLA Account to Defendants. Defendants encouraged and solicited Nussbaum to deploy third-party funds held in the Firm's IOLA Account as short-term loans or bridge financing that would never be repaid. Plaintiff was never solicited by, never communicated with, and never agreed to lend to, any Defendants. Plaintiff's funds were deployed by Nussbaum without Plaintiff's knowledge or consent. Plaintiff was induced by Nussbaum's misrepresentations to wire funds across state lines into the Firm's account. Defendants were aware that these funds would not be repaid to Plaintiff.

142. The wire transfers identified above, and the related allegations incorporated herein constitute predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343 and 18 U.S.C. § 1961(1)(B). Without limiting the generality of the foregoing, Plaintiff identifies the following representative predicate acts of wire fraud:

a. Predicate Act 1 On September 30, 2022, Nussbaum wired $15,000,000 from the Firm's IOLA Account to Feller's YIC PLLC Chase account, Federal Reference Number 20220930B6B7261F002123. The note was due in three days. On October 3, 2022, YIC PLLC repaid $15,375,000 in two return wires -- the $375,000 premium being Nussbaum's 2.5% commission, charged against the investor pool without authorization. The loan lasted seventy-two hours and had a single economic

purpose: to generate a promissory note payable to "MARK J. NUSSBAUM AS NOMINEE" in the face amount of $15,000,000 that could be circulated as proof of institutional lending capacity.

b. Predicate Act 2. On October 7, 2022, Nussbaum wired $6,200,000 from the Firm's IOLA Account to the IOLA account of Hersko and Ehrenreich P.C. (Routing 026013576, Account *6832) -- Feller's own transactional attorneys -- Federal Reference Number 20221007B6B7261F001507. YICIF repaid $6,510,000 on October 18 and 20, 2022, netting Nussbaum another $310,000 commission from the investor pool. A second note payable to "MARK J. NUSSBAUM AS NOMINEE" was generated in the face amount of $6,200,000.

143. Money Laundering (18 U.S.C. §§ 1956, 1957). Money laundering, pursuant to 18 U.S.C. §§ 1956, 1957 occurs when an individual engages in a financial transaction which involved proceeds from specified illegal activity, knew that the proceeds were from illegal activity, and intended the transaction to either promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds. The transactions referenced in this Complaint qualify as money laundering.

144. Bank Fraud (18 U.S.C. § 1344): Defendants misused bank accounts to divert funds owed to Plaintiff for unauthorized purposes.

145. Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957): Defendants engaged in transacting deposits, withdrawals, transfers, and exchanges of funds belonging to Plaintiff, without Plaintiff's knowledge or consent, and/or profits derived from the illicit use of Plaintiff's funds.

146. Plaintiff Blueberry Funding LLC was told by Nussbaum and the Firm that the funds would be safely held in escrow in the Firm's IOLA account, would not be moved without Plaintiff's written authorization, and would be returned upon demand. Those representations were false when made. Nussbaum and the Firm had no intention of holding the funds in escrow and instead intended to wire the funds out of the Firm's IOLA account the following day to Feller and related entities.

147. Each of Defendants conspired to form the Feller-Beitel Enterprise, and committed the illegal and wrongful acts described above which harmed Plaintiff.

148. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business or property, including but not limited to loss of their funds remitted to the Firm's Escrow Account.

149. By reason of the foregoing, Plaintiff is entitled to recover treble damages, costs of suit, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(D)**
**CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(C)**
**(Against All Defendants)**

150. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

151. At all relevant times, each Defendant named in this Count is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

152. As alleged in Count I above, the Defendants formed and operated an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) and conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

153. Beginning no later than 2022 and continuing through the period relevant to this action, each Defendant knowingly agreed with one or more of the other Defendants and Nussbaum to conduct or participate in the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

154. Each Defendant knew of and agreed to the common purpose of the enterprise. That common purpose was to obtain investor funds through false representations, prevent repayment through sustained wire fraud, and suppress enforcement through coordinated lulling and obstruction.

155. Each Defendant agreed that at least two acts of racketeering activity would be committed in furtherance of the enterprise. As set forth in the paragraphs above, the predicate acts of wire fraud committed in furtherance of the enterprise.

156. The agreement of each Defendant is further established by the coordinated and repeated conduct described herein, including the penny-match wires from the Firm's IOLA account to Feller, YIC PLLC and Feller's transaction attorneys, and the acceptance by each such Defendant of the economic benefit of the transactions. That pattern is not consistent with ordinary, arms'-length transactions, and reflects a knowing agreement among the Defendants to participate in the affairs of the enterprise through a pattern of racketeering activity.

157. Each Defendant agreed to the commission of the predicate acts identified above, whether or not that Defendant personally committed each such act.

158. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in their business or property, including but not limited to the loss of the $2 Million Plaintiff wired into the Firm's IOLA account.

159. By reason of the foregoing, Plaintiff is entitled to recover treble damages, costs of suit, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III**
**CONVERSION**
**(Against YIC PLLC and Feller)**

160. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

161. The Plaintiff deposited $2,000,000 in escrow funds into the Firm's IOLA account.

162. The Firm owes a duty to maintain, preserve, and protect Plaintiff's escrow funds, held in the Firm's IOLA account.

163. Nussbaum intentionally and without authority wired the $2 Million to YIC PLLC and Feller.

164. YIC PLLC and Feller accepted assumed or exercised control over the $2 Million.

165. Feller and YIC PLLC had knowledge that Nussbaum was intentionally and without authority wiring monies that belonged to someone else, interfering with the person's right of possession.

166. Feller and YIC PLLC have not returned the $2 Million.

167. Feller and YIC PLLC have wrongfully interfered with Plaintiff's right to possess those funds.

168. Based on the foregoing, Feller and YIC PLLC are liable for conversion of the Plaintiff's escrowed funds totaling $2,000,000.00, interest from the date of the conversion, reasonable attorney's fees, and costs to the Plaintiff.

**COUNT IV**
**CONSPIRACY TO COMMIT CONVERSION**
**(All Defendants)**

169. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

170. The monies deposited by Plaintiff into the Firm IOLA Account were specifically identifiable and were not be used for any purpose without Plaintiff's permission.

171. Defendants never had any right or claim to any of Plaintiff's money that was held in the Firm's IOLA Account.

172. The transfer of the Plaintiff's funds out of the Firm's IOLA Account by Nussbaum was improper and wrongful.

173. Defendants YIC PLLC and Feller, wrongfully took possession of and exercised control over Plaintiff's funds in degradation of and to the exclusion of Plaintiff's rights as part and in furtherance of the conspiracy.

174. Defendant Beitel took over actions in order to ensure the use of Plaintiff's personal property by referring Feller to Nussbaum, transaction Loan 3 without Feller's knowledge, communicating with Nussbaum regarding the wire of funds, payments, misrepresentation, lulling payments, and ensuring the non-enforcement of Loan 3.

175. Defendants, YIC Services was the co-borrower on Loan 3 and made lulling payments.

176. Defendants, YICIF, and MetroMH made lulling payments in furtherance of the conspiracy.

177. By doing so, Defendants have conspired to converted Plaintiff's personal property, without lawful justification, as a result of which Plaintiff has been deprived of its property.

178. Defendants acted with high level of moral culpability as the Defendants planned and executed the aforementioned conversion with wanton dishonesty, malice and intent to oppress Plaintiff..

179. At least $2 Million of Plaintiff's monies were used for the benefit of Defendants, which precluded Plaintiff's from exercising their rights and ownership of the funds. Plaintiff demanded the return of its funds. On July 25, 2023 the Firm issued a payoff letter to Defendants stating the balance due, and on May 12, 2025 the confessions of judgment were filed. Defendants have refused to return the funds. Demand and refusal are established.

**COUNT V**
**AIDING and ABETTING BREACH OF FIDUCIARY DUTY**
**(All Defendants)**

180. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

181. Nussbaum and the Firm owed Plaintiff a fiduciary duty, the escrow agent of Plaintiff's monies held in the Firm's IOLA account.

182. Nussbaum and the Firm owed a fiduciary duty to plaintiff with respect to Plaintiff's monies held in the Firm's IOLA Account, including to maintain, account, protect and preserve same.

183. Nussbaum and the firm had an ethical and fiduciary duties to segregate and preserve Plaintiff's monies held in the Firm's IOLA Account.

184. An attorney holding funds belonging to another is a fiduciary, and an escrow agent is a trustee for every party with a beneficial interest in the escrow who may release the funds only in strict compliance with the conditions of the escrow. A claim for aiding and abetting that breach requires a breach by the fiduciary, that the defendant knowingly induced or participated in it, and damages.

185. Upon information and belief, Nussbaum and the Firm each breached their fiduciary duties by failing to preserve and/or segregate Plaintiff's monies and indeed actively dispersing said monies held in the Firm's IOLA Account.

186. Nussbaum and the firm each had an ethical and fiduciary duty to promptly return to Plaintiff the requested funds upon demand therefor.

187. Upon information and belief, Defendants were aware that the source of the funds used to complete the transactions fraudulently originated from the Firm's IOLA Account.

188. Accordingly, Defendants aided and abetted Nussbaum and the Firm to breach their fiduciary duties owed to Plaintiff by participating in, assisting, and/or otherwise facilitating the conspiracy. Defendants had actual knowledge of the breach. Feller and Beitel were in the group chat when Nussbaum wrote on October 7, 2022 that he was "doing my dd for my investors," and Feller supplied the wire instructions on May 2, 2023 that moved Plaintiff's escrowed funds to YIC PLLC. Each Defendant rendered substantial assistance by soliciting, receiving, retaining, or laundering those funds. As a direct result Plaintiff has been damaged in an amount not less than $2,000,000.

**COUNT VI**
**AIDING and ABETTING FRAUD**
**(All Defendants)**

189. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

190. Nussbaum and the Firm made materially false representations to Plaintiff by (1) soliciting the payment of funds to the Firm's IOLA Account; (2) falsely representing that the funds would not be moved from the Firm's IOLA account without the express written consent of Plaintiff, (3)effectuating the transfers of the funds out of the Firm's IOLA Account to Defendants; and (4) falsely promising to release the escrow funds to Plaintiff.

191. Feller and Beitel each made material misrepresentations of existing fact to Nussbaum, the custodian of Plaintiff's funds, for the purpose of inducing the deployment of Plaintiff's funds to Feller: (a) Feller, October 3, 2022, by WhatsApp: "Revenue at 50mm on track to hit 13mm ebitda"; (b) Beitel, October 7, 2022, by WhatsApp: Feller "is getting weekly from the city between 2 and 5m" and "even in case this will not close he will come up with the cash" ; (c) Feller, October 7, 2022, by WhatsApp: "Money wired is going to escrow"; (d) Feller, February 28, 2023, by WhatsApp: "Want my planes as collateral?" ; (e) Beitel, April 4, 2023, by WhatsApp and voice note: that repayment would come from "1 large payment from city" and a "$7 million" refinancing "closing right after" ; and (f) Feller, April 5, 2023, in the Guaranty: that all financial statements were "true and correct in all material respects" .

192. Beitel further concealed, while soliciting the advance, that he held an interest in a $25,000,000 senior facility to Feller's enterprise, that the facility was governed by a Deposit Account Control Agreement permitting the senior lender to take control of Feller's accounts, and that the facility was in default. Beitel had superior knowledge of those facts, they were not readily available to Nussbaum or Plaintiff, and Beitel knew that the advance was being made in ignorance of them. Under those circumstances, New York law imposed on Beitel a duty to speak.

193. Each representation was false when made, and each omission concealed a material fact. Feller's actual 2022 EBITDA was $3,600,000 by his own March 27, 2024 account. By Feller's own May 16, 2024 account, the city had not paid for thirteen months. No lien on any aircraft or business was ever filed. No $7,000,000 refinancing closed. The financial statements warranted in the Guaranty are contradicted by the entities' own tax filings. Feller's enterprise was in default on $35,000,000 of senior debt by Beitel's own April 23, 2025 account.

194. Feller and Beitel knew the representations were false when made. Feller operated the enterprise and signed its returns. Beitel held a senior secured interest in it, had been on calls with its bank's counsel, described its financings as "my deals," and by his own account had "given him money over and over."

195. The representations were made with the intent that Nussbaum rely on them in deploying the funds in his custody, and he did: "Just doing my dd for my investors. I would lend you on word." Plaintiff, whose money was at risk, was the intended and foreseeable victim of representations made to its custodian, and Plaintiff's funds were deployed to Feller in direct reliance on them. Plaintiff itself was never told of the borrower, the terms, or the representations, and custodian and were Plaintiff's agents for the purpose of holding and safeguarding those funds. One who defrauds an agent is liable to the principal, and the principal need only allege that its agent, acting on its behalf, reasonably relied on the misrepresentations.

196. As a direct and proximate result, Plaintiff has been damaged in an amount not less than $2,000,000, together with consequential damages, interest, and costs. The fraud was deliberate, sustained, and directed at a custodian holding other people's money; punitive damages are warranted.

197. The foregoing is pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure: the speaker, the statement, the date, the medium, the recipient, and the reason the statement was false are set forth for each misrepresentation.

198. Defendants knew about the fraud and substantially assisted all involved in achieving the goals of the conspiracy and in benefiting financially.

199. Defendants have conspired to commit fraud against Plaintiff's personal property, without lawful justification, as a result of which Plaintiff has been deprived of its property.

200. As a result of the Defendants aiding and abetting fraud, Plaintiff has been damaged.

**COUNT VII**
**MONEY HAD AND RECEIVED**
**(All YIC PLLC and Feller)**

201. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

202. Nussbaum and the firm accepted and received Plaintiff's monies into the Firm's IOLA Account.

203. Nussbaum and the Firm improperly transferred Plaintiff's monies for the benefit of the fraudulent scheme.

204. Defendant Feller directed Nussbaum to transfer the monies to Defendant YIC PLLC.

205. Defendants Feller and YIC PLLC receive Plaintiff's monies in the amount of $2 Million.

206. The funds received by Defendants Feller and YIC PLLC were and are property of the Plaintiff.

207. Defendants, Feller and YIC PLLC are not entitled to retain a transfer from the Firm's IOLA Account, which contained Plaintiff's escrow funds.

208. The fair and reasonable value of Plaintiff's loss and of Defendants' collective benefit, as a result of the fraudulent dispersal of Plaintiff's funds from the Firm's IOLA account, is a least the sum of $2 Million. Feller and YIC PLLC received Plaintiff's money, benefited from it, and have refused to return it despite demand. Equity and good conscience do not permit them to keep it.

**COUNT VIII**
**UNJUST ENRICHMENT**
**(Against all Defendants)**

209. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

210. Defendants have been unjustly enriched at the expense of Plaintiff in violation of the common law.

211. In furtherance of their scheme, Defendants knowingly and unlawfully accessed, transferred and/or obtained for their own benefit, without Plaintiff's knowledge or consent, Plaintiff's escrow funds directly from the Firm's IOLA account, even though Defendants were aware that Plaintiff had not authorized the release of the escrow funds and even though Defendant knew they had no legitimate right to the funds.

212. At all relevant time herein, Plaintiff had and continues to have a legal and equitable interest in the $2 Million, which was improperly taken by Defendants, with Defendants' taking of such funds was at Plaintiff's expenses.

213. As a result of Defendant's conduct, they have been and continue to be unjustly enriched by their wrongful receipt of Plaintiff's funds in the amount of $2 Million.

214. Defendants have failed to repay or compensate Plaintiff any meaningful amount since the beginning of their wrongful conduct.

215. By refusing to repay amounts owed to Plaintiff for the escrow funds illegally transferred, Defendants were enriched at Plaintiff's expense.

216. Equity and good conscience militate against permitting Defendants to retain the amounts Plaintiff seek to recover. This Count is pleaded in the alternative to Counts IX and X. As to Beitel, YICIF, and MetroMH, who signed no note or guaranty, no contract governs the subject

matter and unjust enrichment lies directly. As to Feller, YIC PLLC, and YIC Services, Plaintiff pleads unjust enrichment in the alternative should the Loan 3 instruments be held unenforceable.

**COUNT IX**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

217. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

218. Defendants, and others, combined, agreed, and mutually undertook, through concerted actions, to implement the fraudulent scheme described herein.

219. As detailed above, Defendants and others maintain a joint, carefully orchestrated fraudulent scheme through which they intentionally commit numerous unlawful acts.

220. Nussbaum and the Firm knowingly and willfully executed the schemes described herein intending to defraud Plaintiff by, among other things: (1) soliciting the payment of escrow funds as purported proof of access to the Firm's IOLA Account; (2) falsely representing that the funds would not be transferred from the Firm's IOLA Account without the consent of Plaintiff; (3) effectuating the transfers out of the Firm's IOLA Account to Defendants; and (4) falsely promising to release the escrow funds to Plaintiff upon their request despite knowing that the funds had been intentionally dispersed for the benefit of the scheme.

221. Nussbaum and the Firm's representations were false and were made willful knowledge of their falsity.

222. Nussbaum and the Firm made these false representations with the intent that Plaintiff rely on them. More specifically, they made these false representations for the purpose of gaining Plaintiff's trust and coercing them to entrust them with their money, which Defendants ultimately stole.

223. Plaintiff reasonably, foreseeably, and justifiably relied on certain misrepresentations and based on that reliance, deposited $2 Million into the Firm's IOLA account. The reliance upon Nussbaum's and the Firm's fraudulent misrepresentations was material in Plaintiff's decisions to commit capital to the Firm's IOLA Account and would not have done so had they been aware of Defendants' true intentions. Subsequent fraudulent misrepresentations were intended to ensure that Plaintiff did not catch on to the Conspiracy and to prevent them from attempting to retrieve their escrow funds.

224. Each Defendant played an integral role in carrying out the Conspiracy, including providing misrepresentations to induce Loan 3, receipt of stolen monies, providing lulling payments and other actions.

225. As a result of the orchestrated scheme between Defendants and others to secure fraudulently received monies, Plaintiff has suffered substantial damages.

226. By reason of their injury, Plaintiff is entitled to compensatory and punitive damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems proper.

**COUNT X**
**PIERCING THE CORPORATE VEIL**
(Against Defendant Feller)

227. Plaintiff repeats and realleges the foregoing allegations pleaded in this Complaint as if fully set forth at length herein.

228. Defendant used the business entities, Defendants YIC PLLC, YIC Services, YICIF, and MetroMH as vehicles to perpetrate fraud, commit injustice, or circumvent the law, resulting in damages to the Plaintiff.

229. Defendants YIC PLLC, YIC Services, YICIF, and MetroMH served as conduits for the Defendants Feller and Beitel.

230. Defendants YIC PLLC, YIC Services, YICIF, and MetroMH were dominated, and the managers, members, shareholders, trustee, and-beneficiaries is Defendant Feller.

231. The Defendants used the Defendants YIC PLLC, YIC Services, YICIF, and MetroMH as a façade for their fraudulent operation.

232. The Defendants used the Defendants YIC PLLC, YIC Services, YICIF, and MetroMH to commit fraud and/or injustice resulting in damages against Plaintiff.

233. By reason of the piercing of the corporate veil, Defendant Feller should be individually liable to Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Blueberry Funding, LLC respectfully requests that this Court enter judgment against the Defendants Feller, Beitel, YIC PLLC, YIC Services, YICIF, and MetroMH, jointly and severally:

a. Award compensatory damages against the Defendants in an amount to be determined at trial;

b. Award treble damages under the RICO Act against the Defendants;

c. Award punitive damages against the Defendants;

d. Award attorneys' fees and costs against the Defendants;

e. Award pre- and post-Judgment interest against the Defendants; and

f. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September , 2026

By: __/s/Afiyfa Ellington__
Afiyfa Ellington, Esq.
N.Y. ID. NO. 4229811
1 N Johnston Avenue, Suite D-304, Hamilton, NJ 08610
(212) 220.1616 [telephone]
aellington@mfamilyindustries.com